# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
June 20, 2011 Session

## ROSS H. TARVER, et al., v. OCOEE LAND HOLDINGS, LLC., et al.

**Appeal from the Chancery Court for Polk County**
**No. 7442     Hon. Jerri S. Bryant, Chancellor**

---

**No. E2010-01759-COA-R3-CV-FILED-SEPTEMBER 19, 2011**

---

Plaintiffs sued defendants on a sale of real estate contract wherein defendants agreed to purchase certain real estate located in Polk County from plaintiffs for a stated price. Defendants joined issue on the pleadings in the trial before the Trial Judge. The Trial Court held that the purchase and sales agreement was enforceable, and refused to find Ocoee Land Holdings, LLC liable for breach of the purchase and sales agreement, but held Glen Fetzner personally liable. Defendants and plaintiffs have appealed. On appeal, we hold that the purchase and sales agreement was an enforceable contract, but the Court erred when it held Glen Fetzner personally liable for the breach of the purchase and sales agreement, and the Trial Court also erred when it did not find Ocoee Land Holdings, LLC liable for the breach of the contract. We enter Judgment against Ocoee Land Holdings, LLC.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Reversed in Part.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., J., and D. MICHAEL SWINEY, J., joined.

John P. Konvalinka, Chattanooga, Tennessee, for the appellant, Glen Fetzner.
Robert G. Norred, Jr., and James F. Logan, Jr., Cleveland, Tennessee, for the appellees, Tarver and Tarver.
B. Thomas Hickey, Jr., Chattanooga, Tennessee, for the appellee, Crye-Leike of Chattanooga, Inc.
Brian O'Shaughnessy, Chattanooga, Tennessee, for the appellee, Ocoee Land Holdings, LLC.

## OPINION

### Background

On April 16, 2009, plaintiffs Ross H. Tarver and Holly H. Tarver ("the Tarvers") filed a Sworn Complaint against defendants Glen Fetzner, Ocoee Land Holdings, LLC , Ocoee Mountain Homes, LLC and real estate company Crye-Leike of Chattanooga, Inc. They alleged that the defendants, Glen Fetzner, Ocoee Land Holdings and Ocoee Mountain Homes breached a real estate contract wherein they had agreed to purchase certain real estate located in Polk County from the Tarvers for a certain price on or before March 2, 2009. They alleged that the defendants had failed to close the sale by March 2, 2009 or subsequent to that date, and as part of the agreement to sell and purchase the property, defendants had deposited $50,000.00 as earnest money with defendant Crye-Leike. The agreement provided that in the event of the buyers default on the contract, the earnest money would be paid to the sellers. The defendants failed to execute a release of the funds.

The Tarvers complaint made a demand for interpleader against Crye-Leike.[1] They sought specific performance of the real estate contract by the defendants and alternatively, sought the $50,000.00 in earnest money and compensatory damages that would put then in the same position they would have been in if defendants had purchased the property. They also sought an award of $10,000.00 that they claim was owed to them under another agreement they had with defendants in connection to a utility easement. Plaintiffs also sought interest and attorney's fees as provided by the contract.

The complaint states that there was some confusion regarding whether Ocoee Land Holdings, Ocoee Mountain Homes or Mr. Fetzner, individually, was the actual party to the real estate agreement. On May 21, 2009, defendants Ocoee Land Holdings, Ocoee Mountain Homes and Fetzner filed an answer and counterclaim against the Tarvers and subsequently amended their answer on October 26, 2009.

The trial was conducted without a jury before the Chancellor on November 9, 2009. At the close of plaintiffs' proof, defense counsel moved for a "directed verdict"as to the plaintiffs' claims against Ocoee Mountain Homes and Fetzner. The Court granted the motion as to Ocoee Mountain Homes but did not grant the motion as to Fetzner. At the conclusion of the hearing, the Court announced orally that it would dismiss the defendants' counterclaims against plaintiffs. She also found that Ocoee Land Holdings and Glen Fetzner individually had beached the contract and awarded plaintiffs $182,000.00 in damages to plaintiffs as well as reasonable attorney's fees. The determination of the amount of

---

[1] Crye-Leike filed a Complaint for Interpleader with the Chancery Court of Polk County on April 20, 2009 and paid $50,000 into the registry of the court. The interpleader complaint and the Tarvers' complaint were consolidated on July 20, 2009.

attorney's fees was reserved for another hearing.

Plaintiffs filed a motion for attorney's fees and expenses and a motion to alter or amend the judgment based on a computation error, although the final judgment had not been entered. On December 9, 2009, the Court entered a judgment awarding plaintiffs monetary damages in the amount of $232,000.00 against Ocoee Land Holdings and Glen Fetzner jointly and severally, and dismissed Ocoee Mountain Homes, and directed payment to Crye-Leike's counsel of $2,800.00 and $322.50 to Crye-Leike for costs and setting plaintiffs' motion for attorney's fees for hearing. On December 15, 2009, the Court entered an order directing the Clerk and Master to disburse the $50,000.00 in earnest money paid into the court by Crye-Leike in accordance with the judgment.

On December 28, 2009, Ocoee Land Holdings and Glen Fetzner filed a motion to alter or amend judgment, or alternatively for a new trial. Also on that date, the Court entered an order awarding plaintiffs an additional judgment against Ocoee Land Holdings and Glen Fetzner for attorney's fees in the amount of $9,525.00 and costs of $574.75.

On April 6, 2010, the Court entered an order relative to the parties' motions to alter or amend, and modified its earlier judgment of December 9, 2009 as follows:

Plaintiffs shall have a judgment individually against Glen Fetzner in the amount of $278,000.

The Court further awards a judgment in favor of plaintiffs against Ocoee Land Holdings, LLC in the amount of $10,000.

The Tarvers filed a motion to alter or amend the Court's April 6th order as did Ocoee Land Holdings.[2] The Court denied both motions and Glen Fetzner and the Tarvers filed notices of Appeal.

## The Evidence

This case involves several agreements related to real estate in Polk County, Tennessee between plaintiffs and a real estate development company. As there was some confusion at the trial on the part of some of the witnesses and the Judge regarding the various related entities associated with the real estate development company, the following is a list of the entities involved:

1.      Ocoee Land Holdings, LLC  is a Tennessee limited liability company with its

---

[2] Ocoee Land Holdings's motion to alter or amend concerned only the trial court's failure to address its prior award of attorney's fees to the Tarvers and against Ocoee Land Holdings.

principal place of business at 6881 Kings Pointe Parkway, Suite 7, Orlando, Florida 32819. Glen Fetzner testified that he is a managing member of Ocoee Land Holdings. His brother, Paul Fetzner, is the president of Ocoee Land Holdings and manages the day-to-day operations of the business. The third managing member of the Ocoee Land Holdings is Louis Lentine. Mr. Lentine testified that he handles the business side of the LLC, including finance, accounting and real estate closings. The business of Ocoee Land Holdings is land development in Poke County. Ocoee Land Holdings's first purchase of land in Polk County was in 2007 and encompassed over 100 acres that were platted as 216 homesites. Ocoee Land Holdings sells the homesites to individuals.

2. Ocoee Mountain Homes, LLC is a Tennessee limited liability company with its principal place of business at 6881 Kings Pointe Parkway, Suite 7, Orlando, Florida 32819. Ocoee Mountain Homes builds log homes on the homesites Ocoee Land Holdings sells to individuals.[3]

3. Ocoee Realty, LLC handles real estate transactions. This LLC was not an issue in the suit.

4. Ocoee Mountain Club is the name of the development in Polk County where the property purchased by Ocoee Land Holdings is located. Glen Fetzner's testimony was somewhat confusing regarding this entity. He stated that once the land purchased by Ocoee Land Holdings was developed it became Ocoee Mountain Club and that Ocoee Mountain Club was owned by the three managing members of Ocoee Land Holdings. He further stated that Ocoee Mountain Club was not owned by the three LLCs, Ocoee Land Holdings, Ocoee Mountain Homes or Ocoee Realty. He then said that he "guessed" Ocoee Mountain Club was a d/b/a. Mr. Fetzner then testified as follows:

THE COURT: So is that four entities?

A: I guess it's a d/b/a. I never really . . .

THE COURT: Give me the fourth entity. I have Ocoee Land Holding, LLC, Ocoee Mountain Homes, LLC, Ocoee Mountain Club.

A: Ocoee Mountain Club is just the name of the development. I think that's were the confusion is. Everything was purchased under - - when we purchase property for the

_____

[3] Ocoee Mountain Homes was a named defendant in the suit but was dismissed after plaintiffs' proof on the defendants motion for directed verdict.

development, it's always purchased under Ocoee Land Holdings, LLC.

Questioning by counsel for defendants resumed:

Q: So are you saying that Ocoee Land Holdings, LLC does business as Ocoee Mountain Club?

A: Yes.

Q: Is Ocoee Mountain Club an LLC?

A. No, it is not.

Q: Does it have any officers or directors?

A: No, it does not.

Q: How does it function?

A: I guess it would be - - it's a d/b/a of Ocoee Land Holdings.

The record establishes that Ocoee Land Holdings, Ocoee Mountain Homes and Ocoee Realty are all LLCs. However the legal status of Ocoee Mountain Club is unclear as Fetzner first stated that Ocoee Mountain Club was owned by himself, his brother Paul Fetzner and Lewis Lentine and that he guessed it was a d/b/a. On further direct examination by his attorney, he responded to counsel's leading question that Ocoee Mountain Club was a d/b/a of Ocoee Land Holdings. No other witness was called by either party to address the legal status of Ocoee Mountain Club.

The property at issue in this suit is part of what is known as the Elrod Property. Plaintiffs Ross and Holly Tarver are residents of Polk County, and owned lots 17, 18 and 19 of the Elrod Property since the mid-1990s. Ross Tarver was one of five partners in Chilihowie Properties, a Tennessee general partnership, which owned lots 11 and 12 of the Elrod Property. All of the five lots that the Tarvers had an interest in were for sale and in February 2008 Paul Fetzner, one of the managing members of Ocoee Land Holdings, approached Mr. Tarver regarding the purchase of all five lots. Mr. Tarver testified that he negotiated the sale of the lots with Paul Fetzner and that the buyers were represented by a real estate agent, Tammy Davis.

In February 2008 a "lot/land purchase and sale agreement" was entered into between Chilihowie Properties as seller and Ocoee Mountain Club as buyer for the purchase and sale of lots 11 and 12 for $185,000.00. The contract was signed by Ross Tarver as seller and

Glen Fetzner as buyer. The sale of lots 11 and 12 closed on May 6, 2008, and the warranty deed conveyed the property to Ocoee Land Holdings, LLC and was signed by all five partners of Chilihowie Properties. After lots 11 and 12 were sold to Ocoee Land Holdings an office was built on the lots.

Before the closing of lots 11 and 12, another "lot/land purchase and sale agreement" was entered into between Ocoee Mountain Club as buyer and Ross and Holly Tarver as seller for lots 17, 18 and 19. The final purchase price of $500,000.00, an earnest money provision of 10% of the sale price ($50,000.00) which was non-refundable was to be credited back to the buyers at the closing date of March 2, 2009.

Glen Fetzner testified that although the purchase and sale agreement (P & S Agreement) for lots 17, 18 and 19 provides that it is an agreement between Ocoee Mountain Club and the Tarvers, is was really an agreement between Ocoee Land Holdings and the sellers. He also stated that although the document bears his signature without any language that signifies that he was signing in a representative capacity, his intent was not to sign as an individual but as a managing member of Ocoee Land Holdings, LLC.

Mr. Tarver testified that he did not have his wife Holly sign the purchase agreement for lots 17, 18 and 19 because Ocoee Land Holdings's realtor, Tammy Davis, told him that Holly did not need to sign the agreement although her presence at the closing was required. Mrs. Tarver confirmed Mr. Tarver's testimony and further stated that she had authorized Mr. Tarver to enter into the contract on behalf of both of them, that she was aware of the agreement, she did not object to the sale and she was excited about the sale. She explained that she and her husband had plans to use the profits from the sale of lots 17, 18 and 19 to finance a purchase of another property they had bought. Pursuant to the P & S Agreement the buyers paid $50,000.00 in earnest money to their real estate agent Crye-Leike of Chattanooga who placed the deposit in escrow.

Tammy Davis testified that she prepared the P & S Agreement for lots 17, 18 and 19 on behalf of her client and that she had typed in "Ocoee Mountain Club" as the buyer . When asked who her client was she stated that it was "the LLC Ocoee Mountain Club as a group is what I understood." Immediately after making that statement she identified the buyer as Ocoee Mountain Club the "partnership". On cross-examination by defendants' counsel, she maintained that Glen and Paul Fetzner and Lou Lentine had told her that the name of their "partnership" was Ocoee Mountain Club and that she had never heard of Ocoee Land Holdings.

A pertinent part of the P & S Agreement to this suit provides that should the buyer default the earnest money shall be forfeited as damages to the seller and the seller may sue in contract or tort for additional damages or specific performance of the agreement, or both. The prevailing party shall be entitled to recover all cost of litigation including reasonable

attorney's fees.

In August 2008 the new owners of lots 11 and 12 built a log and stone building on the lots to be used as the sales office of Ocoee Mountain Club. Paul Fetzner approached Mr. Tarver and requested a water line easement across lots 17, 18 and 19 to serve the sales office. The Tarvers agreed to execute such an easement as it was anticipated that Ocoee Land Holdings would become the owner of lots 17, 18 and 19 on or before March 2, 2009. The utility easement grant reflects the following:

> In consideration of the grant of said easement, Ocoee Land Holdings, LLC has an Option to Purchase Lots 17, 18 and 19 of Elrod Property and if said Option to Purchase is not exercised by March, 2009, then Ocoee Land Holdings, LLC shall pay immediately to the Grantors the amount of $10,000.000.

The parties to the grant of the easement are listed as Ross and Holly Tarver as grantors and Ocoee Land Holdings, LLC as grantee. The grant is signed by both Ross and Holly Tarver and by Paul Fetzner as Chief Manager of Ocoee Land Holdings, LLC. Further, there is a notarial statement that Paul Fetzner had sworn that he was authorized as chief manager of Ocoee Land Holdings, LLC to execute the instrument.

A few days before March 2, 2009, the day designated for the closing on lots 17, 18 and 19, Paul Fetzner and Lou Lentine contacted Mr. Tarver and informed him that they had not been able to obtain financing for the purchase of lots 17, 18 and 19 and that they needed a 90 day extension to close the sale. There is no proof in the record other than Glen Fetzner's testimony regarding the defendants' inability to obtain financing. Mr. Tarver testified that he could not grant the extension as he had other obligations to meet and he needed the proceeds of the sale. The closing did not occur on March 2, 2009 and Ocoee Land Holdings did not allow for the release of the $50,000.00 earnest money to the Tarvers as provided in the sale and purchase agreement. Nor did Ocoee Land Holdings pay the Tarvers $10,000.00 for the utility easement pursuant to the easement grant.

On March 8, 2009, Mr. Tarver, through counsel, sent a letter to Mr. Lentine demanding that the $50,000.00 in escrowed funds be released to them and that Ocoee Land Holdings pay $10,000.00 for the utility easement as provided by the grant should the sale of lots 17, 18 and 19 close.

Glen Fetzner testified in his deposition that he understood the sale purchase agreement and that he thought they owed the Tarvers $50,000.00 because they did not close on the contract. When he was asked why the $50,000.00 was not released he stated that question should be asked of his partner.

Plaintiffs presented the testimony of real estate appraiser Donnie Stephenson who

stated that Ocoee Mountain Club employed him to perform an appraisal of lots 17, 18 and 19 and that someone had contacted him a couple of weeks before the effective date of the appraisal which was March 27, 2009. The date the appraisal was signed by Mr. Stephenson was January 11, 2009. Mr. Stephenson was not asked about this discrepancy between his testimony and the document at trial. It was his opinion that as of the effective date of March 27, 2009, the fair market value of the property was $222,000.00. He based his opinion on comparable properties in Polk County that sold within the two years prior to March 2009. He stated that the fair market value would not have changed drastically between March 2nd, the date the closing should have occurred and March 27th, thus the appraised value should have been the same on those dates.

The first issue on appeal is:

Whether the Trial Court erred when it held that the purchase and sale agreement was an enforceable contract?

A trial court's findings of fact in a non-jury trial are reviewed *de novo* upon the record. The trial court is afforded a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13 (d); *Wright v. City of Knoxville,* 898 S.W.2d 177, 181 (Tenn. 1995). We review credibility determinations made by the trial court with great deference. *Keaton v. Hancock County Bd. of Educ.,* 119 S.W.3d 218, 223 (Tenn. Ct. App. 2003).

The trial court's conclusions of law are reviewed under a purely *de novo* standard with no presumption of correctness. *Taylor v. Fezell,* 158 S.W.3d 352, 357 (Tenn. 2005)*, Union Carbide Corp. v. Huddleston* 854 S.W.2d 87, 91 (Tenn. 1993). The interpretation of written agreements is a matter of law that this Court reviews *de novo* on the record according no presumption of correctness to the trial court's conclusions of law. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609 (Tenn. 2006).

Glen Fetzner contends that the Trial Court erred when it awarded a judgment in favor of the Tarvers and against Glen Fetzner because the lots 17, 18 and 19 Purchase and Sale Agreement is not an enforceable contract because Mrs. Tarver did not sign the agreement nor does the document have the signature of an authorized agent acting on her behalf.

The Trial Court stated that it was going to look at the three agreements, the P & S Agreement, the Lots 11 and 12 contract and the utility easement document as "one big transaction . . . because they were all hooked together." The Trial Court held that although the lack of Mrs. Tarver's signature on the P & S Agreement could have been problematic, Mrs. Tarver had ratified the P & S Agreement when she signed the grant of a utility easement document that referenced the P & S Agreement and that the demand letter sent to the defendants was further evidence of ratification.

It is undisputed that the Tarvers owned lots 17, 18 and 19 of the Elrod Property in tenancy by the entirety at the time the P & S Agreement was entered into. It is a well-settled proposition that tenancy by the entirety is a form of property ownership which is unique to married persons. *Grahl v. Davis*, 971 S.W.2d 373, 378 (Tenn. 1998)(citing *Griffin v. Prince,* 632 S.W.2d 532, 534 (Tenn.1982)). The essential characteristic of a tenancy by the entirety is that "each spouse is seized of the whole or the entirety and not of a share, moiety, or divisible part." *Grahl* at 378 (citing *Sloan v. Jones,* 192 Tenn. 400, 241 S.W.2d 506, 507 (1951)). A tenancy by the entirety can be terminated only when both convey the property, when one spouse dies and the survivor becomes owner of the whole, or when the survivorship is dissolved by divorce and the parties become tenants in common in the property. *White v. Watson*, 571 S.W.2d 493, 495 (Tenn. Ct. App. 1978).

Mr. Fetzner relies on *Cartwright v. Giacosa*, 390 S.W.2d 204 (1965) for his position that under Tennessee law, when a husband and wife own property as joint tenants by entireties both must sign an agreement to sell the property in order for the agreement to be enforceable, or the agreement must contain a clear representation that the spouse signing the agreement is doing so individually and also as an agent acting on behalf of the other spouse.

The facts and circumstances relating to the P & S Agreement in this case are similar to those in *Cartwright*. In both cases the property was owned in tenancy by the entirety, and the contracts at issue were both for the sale of the property. The contracts both provided that the husband and wife were the sellers of the property but only the husbands signed the contracts. Further, there was no language in either contract that the husband was signing in his individual capacity as well as signing for his wife. It should be noted, however, that there are two significant differences between the facts presented in the two cases. The first is that the Tarvers claim that the only reason Mrs. Tarver did not sign the agreement was that Mr. Tarver was told by the real estate agent for the buyers that her signature was not necessary on the P & S Agreement but that she would have to attend the closing. The second difference is that in *Cartwright* it was the sellers who sought to use the lack of signature to defeat the enforceability of contract against the buyers. Here, it is the buyers, who seek to use the lack of signature of one of the sellers against the sellers.

Defendant Glen Fetzner makes the argument that because the P & S Agreement is unenforceable by or against Mrs. Tarver because of the lack of her signature, the agreement lacked mutuality and consideration because, until the closing date, Mrs. Tarver had the unilateral right to decide to perform under the contract or to refuse to allow the sale to go forward. Defendant supports this contention with the case *Horne v. Phillips*, E1999-00141-COA-R3-CV, 2000 WL 224623 (Tenn. Ct. App. Feb. 28, 2000).[4] *Horne* involved an

---

[4] The Tarvers state in their brief that the holding of *Horne v. Phillips* was raised for the first time on
(continued...)

agreement to purchase real estate, was in the form of a hand written document drafted by Mr. Phillips, the seller, and was signed by Mrs. Phillips and the buyer, Mr. Horne. The second paragraph of the contract provided that the buyer Horne had the unilateral right to cancel the contract and get his down payment returned to him. The contract does not provide a similar right to cancellation to the sellers. Prior to the sale closing, the sellers decided they did not want to go through with the sale and they notified the buyer and attempted to return the down payment. The buyer refused to accept the returned down payment and sued for specific performance. The trial court held that the agreement was enforceable and ruled in favor of the buyer. This Court reversed the trial court, holding that because the agreement created a unilateral right to the buyer to cancel the sale with no resulting consequences to him the contract was unenforceable as it lacked both mutuality and consideration. *Horne* at * 3.

To recap Glen Fetzner's argument the P & S agreement is not enforceable, he argues, one, that the statute of frauds required Mrs. Tarver's signature on the P & S agreement, thus the agreement is not enforceable as to her. He argues, two, that as the agreement was not signed by Mrs. Tarver, it was not enforceable as to her and she could have refused to allow the sale at any time. As the buyer did not have a reciprocal right to back out of the agreement, the contract is unenforceable as to all parties for lack of mutuality and consideration.

We do not take issue with Glen Fetzner's legal arguments but we conclude the P & S Agreement is enforceable based on the doctrine of equitable estoppel and this Court's application of that doctrine in *Autry v. Boston*, E2005-001030-COA-R3-CV, 2006 WL 1132075 (Tenn. Ct. App. Apr. 28, 2006) and *Thornton v. Marcum,* E2007-01326-COA-R3-CV, 2008 WL 836368 (Tenn. Ct. App. Mar. 31, 2008).

It is fundamentally inequitable to find that Mrs. Tarver's failure to sign the P & S Agreement would preclude the Tarvers from enforcing the agreement when it was the buyer's real estate agent who gave Mr. Tarver false and misleading information that her signature was not required on the document. Moreover, Mrs. Tarver testified that had she not been give such false information she would have signed the agreement, that she wanted the sale of the property to go forward, and in fact she had waited for years for the right time to sell the property. Unlike the facts in the cases relied upon by Glen Fetzner, it was the buyers who refused to act on the contract of sale and not the Tarvers. In fact, all of the parties acted as if the contract was enforceable and Glen Fetzner acknowledged that the buyers had breached the contract and that he believed that after the March 2, 2009 sale date passed they owed $50,000.00 in earnest money to the Tarvers. We conclude that the application of the doctrine of equitable estoppel is appropriate and just, and we recently

---

[4](...continued)
appeal. However, Glen Fetzner did raise the issue in his Amended and Restated Memorandum of Law in Support of Motion to Alter or Amend Judgment, p. 15, filed with the trial court.

applied this doctrine of equitable estoppel in the two cases mentioned wherein the defendants sought to employ the statute of frauds as a defense.

The *Autry* Court observed,"[i]t is well settled in Tennessee that an oral contract for the sale of land will not be enforced on the basis of part performance, nor will part performance take an oral agreement out of the statute of frauds." *Autry* at * 7. However:

[t]he harshness of this rule has been mitigated by the application of the doctrine of equitable estoppel in exceptional cases where to enforce the statute of frauds would make it an instrument of hardship and oppression, verging on actual fraud.

Equitable estoppel, in the modern sense, arises from the 'conduct' of the party, using that word in its broadest meaning, as including his spoken or written words, his positive acts, and his silence or negative omission to do any thing. Its foundation is justice and good conscience. Its object is to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which might have existed, or been enforceable by other rules of law, unless prevented by an estoppel; and its practical effect is, from motives of equity and fair dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel.

*Id.* (quoting *Evans v. Belmont Land Co. .,* 92 Tenn. 348, 21 S.W. 670, 673-74 (Tenn.1893)). The *Autry* Court went on to say that:

the statute [of frauds] should be strictly adhered to and construed to accomplish its purpose, ... [however] it should not be used to avoid contracts or to "grant a privilege to a person to refuse to perform what he has agreed to do.".... The courts have accordingly recognized that equitable estoppel is an exception to the statute of frauds, and that equitable estoppel can be used to relieve a party from the statute of frauds where enforcement would make the statute an instrument of hardship and oppression."

*Autry* at * 7 (citing *Ogle v. Ogle,* No. 03A01-9301-CV-00354, 1994 Tenn. App. LEXIS 69, 1994 WL 45451 (Tenn. Ct. App. Feb. 17, 1994), *no appl. perm. appeal filed,* (quoting *GRW Enters., Inc. v. Davis,* 797 S.W.2d 606, 611 (Tenn. Ct. App.1990) (citations omitted)).

Subsequently, this Court applied the doctrine of equitable estoppel in the case of *Thornton v. Marcum,* E2007-01326-COA-R3-CV, 2008 WL 836368 (Tenn. Ct. App. Mar. 31, 2008).

We affirm the ruling of the Trial Court on this issue, although on a different basis. *See Kelly v. Kelly,* 679 S.W.2d 458, 460 (Tenn. App.1984).

The second issue is:

Whether the Trial Court erred when it held that Glen Fetzner was personally liable for breach of the purchase and sale agreement and that Ocoee Land Holdings, LLC was not liable for breach of the purchase and sale agreement?

Both Glen Fetzner and the Tarvers appeal the Trial Court's final judgment finding Glen Fetzner individually solely liable to the Tarvers for breach of P & S Agreement. Glen Fetzner contends that he signed the P & S Agreement in his capacity of a managing member of Ocoee Land Holdings, LLC and not in his individual capacity. The Tarvers contend that the Trial Court's original judgment finding Glen Fetzner, individually, and Ocoee Land Holdings, LLC jointly and severely liable to the them was correct. Under the LLC Act and the Revised LLC Act, members of an LLC are empowered and authorized to execute documents and instruments on behalf of the LLC. Tenn. Code Ann. §§ 48–238–103, 48–249–402.

Mr. Fetzner, as a member of Ocoee Land Holdings, would have had the authority to execute the P & S Agreement on behalf of the LLC and if he entered into the agreement in his capacity of managing member of the LLC, he would not be held individually liable for the LLC's breach of the contract. *See* Tenn. Code Ann. §48-217-101 and Tenn. Code Ann. § 48-249-114. Pursuant to these provisions of the Act, a member, holder of financial interest, governor, manager, employee, or other agent of an LLC does not have any personal obligation and is not otherwise personally liable for the acts, debts, liabilities, or obligations of the LLC whether such arise in contract, tort, or otherwise, or for the acts or omissions of any other member, manager, governor, employee or other agent of the LLC. *See also Collier v. Greenbrier Developers, LLC*, E2008-01601-COA-R3-CV, 2009 WL 1026025 at * 4 (Tenn. Ct. App. Apr. 16, 2009).

The issue before us is who was the buyer who contracted with the Tarvers to purchase lots 17, 18 and 19? The P & S Agreement was prepared by buyer's real estate agent and indicates that the buyer was Ocoee Mountain Club but on the signature page of the Agreement Glen Fetzner's name appears over the line for the buyer's signature with no indication that he was signing in an agency capacity for Ocoee Mountain Club or Ocoee Land Holdings, LLC. Although Mr. Fetzner's testimony at trial was contradictory regarding Ocoee Mountain Club, as he said that Ocoee Mountain Club was a d/b/a for himself, his brother Paul Fetzner and Lou Lentine as individuals and then said that Ocoee Mountain Club was a d/b/a/ for Ocoee Land Holdings, it is clear that Ocoee Mountain Club was not a legal entity capable of entering into a contract. Further there is no indication in the contract that Ocoee Land Holdings was the buyer. Thus, the contract is ambiguous as to who the parties intended the buyer to be.

Our Supreme Court has provided us guidance regarding contract interpretation when

the contract is ambiguous in *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609 (Tenn. 2006) as follows:

> The interpretation of written agreements . . . is a matter of law that this Court reviews *de novo* on the record according no presumption of correctness to the trial court's conclusions of law. *See Guiliano v. Cleo, Inc.,* 995 S.W.2d 88, 95 (Tenn.1999); *Union Planters Nat'l Bank v. Am. Home Assurance Co.,* 865 S.W.2d 907, 912 (Tenn. Ct. App.1993). A cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties. *Christenberry v. Tipton,* 160 S.W.3d 487, 494 (Tenn. 2005). In interpreting contractual language, courts look to the plain meaning of the words in the document to ascertain the parties' intent. *Planters Gin Co. v. Fed. Compress & Warehouse Co.,* 78 S.W.3d 885, 889–90 (Tenn.2002). This Court's initial task in construing the lease at issue is to determine whether the language is ambiguous. *Id.* at 890. If the language is clear and unambiguous, the literal meaning controls the outcome of the dispute. *Id.* If, however, the words in a contract are susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language. *Id.*
>
> * * *
>
> When contractual language is found to be ambiguous, the court must apply established rules of construction to determine the intent of the parties. *Planters Gin Co.,* 78 S.W.3d at 890. An ambiguous provision in a contract generally will be construed against the party drafting it. *Hanover Ins. Co. v. Haney,* 221 Tenn. 148, 425 S.W.2d 590, 592 (1968); *Vargo v. Lincoln Brass Works, Inc.,* 115 S.W.3d 487, 492 (Tenn. Ct. App.2003). Furthermore, when a contractual provision is ambiguous, a court is permitted to use parol evidence, including the contracting parties' conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract. *See Memphis Housing Auth. v. Thompson,* 38 S.W.3d 504, 512 (Tenn.2001); *Fidelity–Phenix Fire Ins. Co. of New York v. Jackson,* 181 Tenn. 453, 181 S.W.2d 625, 631 (1944); *Vargo,* 115 S.W.3d at 494.

*Watson* at 611- 612 .

Pursuant to *Watson*, this Court may look to parole evidence to discern the intent of the parties. The testimony and evidence presented at trial supports appellate Glen Fetzner's contention that Ocoee Land Holdings was the intended buyer. Tammy Davis, the real estate agent who actually typed in the name "Ocoee Mountain Club" on the contract was confused about who her client was. At trial she responded to the question of whether she had represented Ocoee Land Holdings before this transaction with a "yes". Later she stated that her client was "the LLC. Ocoee Mountain Club as a group . . . ." Still later, she stated that she believed the "partnership" to be Ocoee Mountain Club. As confusing as her testimony

was about her client's identity, she never testified that her client was Glen Fetzner, individually.

Glen Fetzner's testimony regarding the status of Ocoee Mountain Club as a d/b/a is also not helpful as it is contradictory. However, his testimony was unequivocal that he signed the P & S Agreement "as a representative of the LLC, a managing member for Ocoee Land Holdings, LLC." He stated that he had no intention of purchasing lots 17, 18 and 19 for himself individually. He also testified that all of the land purchased for the development of Ocoee Mountain Club was purchased by Ocoee Land Holdings, LLC. This statement is supported by the warranty deed for lots 11 and 12 that shows that Chilhowie Properties granted the deed to Ocoee Land Holdings, LLC even though the P & S Agreement for that conveyance listed the buyer as Ocoee Mountain Club. Mr. Fetzner executed an addendum to the P & S Agreement and identified himself by writing "managing member" underneath his signature. He testified that he was acting in a representative capacity as a managing member of Ocoee Land Holdings, LLC when he did that. Mr. Fetzner also stated that it was Ocoee Land Holdings, LLC that paid the earnest money in association with the lots 17, 18 and 19 transaction.

The evidence on the negotiation process that led to the signing of the P & S Agreement also supports a finding that the parties did not intend Glen Fetzner, individually, to be the buyer. Mr. Tarver testified that it was Paul Fetzner who first approached him regarding the sale of lots 11 and 12 and lots 17, 18 and 19 and it was Paul Fetzner with whom he negotiated. While Mr. Tarver was testifying about the negotiations and the transactions he repeatedly referred to the buyer as "they", which would indicate that he did not think Glen Fetzner alone was the buyer. He even stated that he assumed that the buyer was Ocoee Land Holdings. Mr. Tarver discussed the utility easement that he and his wife granted to Ocoee Land Holdings for a water line to run through lots 17, 18 and 19 to lots 11 and 12. He stated that it was Paul Fetzner who called him and asked for the easement and at that time he discussed the pending closing on lots 17, 18 and 19. During this testimony Mr. Tarver used the word "you" when referring to the buyer of lots 17, 18 and 19. The Grant of Utility Easement states that lots 11 and 12 are owned by Ocoee Land Holdings and references the P & S Agreement for lots 17, 18 and 19 by stating that Ocoee Land Holdings "has an Option to Purchase lots 17, 18 and 19 . . ." The Grant of Utility Easement was signed by Paul Fetzner as Chief Manager of Ocoee Land Holdings, LLC.

Mr. Tarver explained that he had talked to Paul Fetzner in January 2009 about the pending March 2nd closing on lots 17, 18 and 19 and stated that he had kidded with Paul that "you guys" could close early. Mr. Tarver stated that a short time before March 2nd Paul Fetzner and Lou Lentine asked for an appointment to come see him in his office. They explained that they were having trouble getting financing and they needed an extension on the closing. Glen Fetzner was not involved in any of the negotiations with Mr. Tarver.

Numerous printed emails between Mr. Tarver and representatives of Ocoee Land Holdings regarding lots 17, 18 and 19 were introduced at trial. These emails were between Lou Lentine or Paul Fetzner and Ross Tarver. Tammy Davis was involved in several regarding earnest money. Notably none of the emails was generated by Glen Fetzner or addressed to him and he was only copied on just a few of the messages. There is nothing in this body of electronic correspondence that would indicate that Glen Fetzner, individually was the intended buyer of lots 17, 18 and 19.

As further evidence of Mr. Tarver's belief that his contract for the sale of lots 17, 18 and 19 was not with Glen Fetzner individually, the Tarvers moved the Trial Court to amend its Judgment to assess all damages against Ocoee Land Holdings or to revert back to its original decision against Ocoee Land Holdings jointly and severely with Glen Fetzner.

The weight of the evidence presented at trial demonstrates that everyone involved in the lots 17, 18 and 19 transactions knew that Glen Fetzner individually was not the intended buyer under the contract. The evidence further demonstrates, based on the easement document, the addendum to the P & S Agreement and the warranty deed that it was the intent of the parties that Ocoee Land Holdings, LLC was the buyer. Moreover, the testimony that Ocoee Land Holdings, LLC had purchased property in the area for the Ocoee Mountain Club development in the past was uncontroverted. For the foregoing reasons, the Judgment of the Trial Court finding Glen Fetzner solely liable to the Tarvers for breach of contract is reversed. We hold that the evidence presented demonstrates that the representatives of Ocoee Land Holdings as well as the Tarvers intended that Ocoee Land Holdings be the purchaser of lots 17, 18 and 19 under the P & S Agreement. Accordingly, the Trial Court erred when it did not find Ocoee Land Holdings, LLC liable to the Tarvers for breach of that agreement.

The third issue is:

Whether the Trial Court erred in limiting cross examination of the Tarver's expert witness regarding his real estate appraisal

Appellant Glen Fetzner appeals the Trial Court's sustaining plaintiffs' objection regarding defendant's cross-examination of real estate appraiser Donny Stephenson. Stephenson's appraisal stated that it was effective on March 27, 2009, twenty-five days after the closing date of March 2, 2009. Mr. Stephenson testified that as of March 27, 2009, the market value of lots 17, 18 and 19 was $222,000.00. When asked by counsel for plaintiffs whether the market value would have changed between March 2nd and March 27th, Mr. Stephenson said that " [t]he market would not have changed drastically within that period of time." On cross-examination, he was asked "[h]ow has it [the real estate market] changed between March and now?" The Tarver's counsel objected to this questions and the Trial Court sustained the objection. Counsel for the defendants contended that the question was

-15-

"relevant to the appraiser's knowledge of the conditions of the real estate market."

Questions regarding admissibility, qualifications, relevancy and competency of expert testimony are entrusted to the discretion of the trial court. In general, questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court. *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997) (citing *State v. Ballard,* 855 S.W.2d 557, 562 (Tenn.1993)). The trial court's ruling in this regard may only be overturned if the discretion is arbitrarily exercised or abused. *McDaniel* at 263.

The general rule and proper measure of damages available to a seller against a breaching buyer in a real estate transaction is that the seller is entitled to the difference between the contract price and the fair market value of the property at the time of the breach." *BancorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 228 (Tenn. Ct. App. 2006)(citing *Turner v. Benson,* 672 S.W.2d 752, 754 (Tenn.1984). Thus, the defendant's question to the appraiser regarding the state of the real estate market from the time of the breach to the time of trial was not relevant to the establishment of the fair market value of the property at the time of the breach. The Trial Court did not abuse its discretion when it sustained plaintiffs' objection to the question.

In sum, the Trial Court did not err when it held the Purchase and Sale Agreement was an enforceable contract. The Trial Court erred when it held Glen Fetzner was personally liable for breach of the Purchase and Sale Agreement and we reverse that holding. The Trial Court also was in error when it did not find Ocoee Land Holdings, LLC liable for breach of the Purchase and Sale Agreement. We hold that Ocoee Land Holdings, LLC is liable for the breach of the Purchase and Sale Agreement, and award the Judgment found by the Trial Court against it. The Trial Court did not abuse its discretion when it sustained plaintiffs' objection regarding defendant's question to the real estate appraiser on the state of the real estate market between March 2009 and the time of trial.

As explained in the foregoing, we affirm the Trial Court's Judgment in part and reverse in part and remand to the Trial Court, with the cost of the appeal assessed to Ocoee Land Holdings, LLC.

_____
HERSCHEL PICKENS FRANKS, P.J.